## THE CARLTON. *

## UNITED STATES SHIPPING BOARD et al. v. GLASGOW SHIPOWNERS' CO., Limited, et al.

## THE GIBRALTAR.

### No. 5918.

Circuit Court of Appeals, Fifth Circuit.

April 1, 1931.

Fred Cubberly, U. S. Atty., and Geo. E. Hoffman, Asst. U. S. Atty., both of Pensacola, Fla., and Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., and William I. Connelly, Atty. United States Shipping Board, both of New Orleans, La., for appellants.

Robert S. Erskine, of New York City, and Philip D. Beall, of Pensacola, Fla. (Kirlin, Campbell, Hickox, Keating & McGrann and Henry P. Elliott, all of New York City, on the brief), for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

This is a case of collision, presented by a libel on behalf of appellant and by a cross-libel on behalf of appellee. The collision occurred between the steamships Carlton and Gibraltar in the harbor of Pensacola, Fla., on April 20, 1928. The District Court held the Carlton solely at fault.

There is very little conflict in the evidence except as to immaterial matters. The accuracy of the log book of the Gibraltar is challenged, and there are the usual differences in the testimony of the witnesses in estimating distances and fixing the time of certain occurrences in the chain of events leading up to the collision. The differences in time result largely from the inaccuracy of a clock on the Carlton. When this is taken into consideration, there is no material difference between the witnesses on this point.

The record supports the following conclusions as to the material facts: Both the Carlton and the Gibraltar were at anchor in the harbor of Pensacola overnight on April 19. The Carlton is of approximately 5,100 gross tons and the Gibraltar is of approximately 4,300 gross tons. Both were partly loaded and intended to dock the next morning. They were anchored about three-fourths of a mile off the Palafox street wharf and a little to the west of the wharf. The Gibraltar was destined to the east side of the Commendencia street wharf, in the slip between that wharf and the Tarragona street wharf, which is next to it on the east. The Carlton was destined to the east side of the Tarragona street wharf. The Carlton was at anchor to the west of the Gibraltar, about three ship lengths away from her, approximately 1,200 feet, and practically abreast of her. The Palafox street wharf is some 500 or 600 feet west of the Commendencia street wharf. These docks extend out from the north shore of the bay in a direction a few points east of south. The tide was about flood stage, and running in about a northwest direction, so that the ships swinging at anchor were headed away from the shore and out into the bay. About 6 o'clock in the morning each vessel was boarded by a harbor pilot, officially designated as a deputy harbor master. These pilots each knew to what dock the other ship was going. The Gibraltar raised her anchor and got under way about 6:19 o'clock and proceeded at half speed with her helm hard astarboard to swing in an arc to the left and straighten up to enter the slip between the Commendencia and Tarragona street wharves. When she had straightened up her helm was eased off and put amidships, and she proceeded on her way, dropping to slow speed at about 6:22. The Carlton got under way at about 6:21 or 6:22, some two or three minutes after the Gibraltar, and proceeded at full speed with her helm hard astarboard.

*Rehearing denied May 23, 1931.

This brought her up on the port side of the Gibraltar, which she was overtaking. She blew a signal of two blasts of her whistle, indicating her intention to pass to port. Her pilot testified that he intended to cross the bow of the Gibraltar, by direction of the Carlton's master. The Gibraltar answered with two blasts, and then, almost immediately, seeing the imminence of a collision, reversed her engines full speed astern and blew three blasts of her whistle, to indicate her propellor had been reversed, her helm remaining amidships. The Carlton was approaching the Gibraltar on the latter's port side at an angle variously estimated by the witnesses but probably about 45 degrees. She, too, saw the imminence of the collision, reversed her engines full speed astern, dropped first her port anchor to swing her about and then dropped her starboard anchor. Her speed was considerably checked, but nevertheless the collision occurred, the stem of the Carlton striking the Gibraltar about 15 feet aft of her center on the port side. The Carlton's stern was bent to port and the Gibraltar suffered some damages. The collision occurred a little to the west of the Commendencia wharf and about 1,000 to 1,200 yards out from it.

In the circumstances above disclosed, it is clear that the Carlton was at fault. Considering that she was anchored to the west of the Gibraltar, was destined for a berth to the east of that vessel, and that she left her anchorage three minutes after the Gibraltar, it would have been a usual and proper maneuver for her to swing in a wide arc and go completely around the course of the Gibraltar, to come up in a position where she could run into her dock. Instead of doing that she swung in a smaller arc and proceeded at greater speed than the Gibraltar, which in itself was an error, and came up on the Gibraltar's port side. After doing so, there is no doubt that she intended to forge ahead and cross the Gibraltar's bow in order to get to her own berth. There was not room for that maneuver, and it was too dangerous to be attempted. She was also wrong under any interpretation of the navigation rules. The Pilot Rules for Inland Waters of the Atlantic and Pacific Coasts and the Gulf of Mexico, which govern navigation of vessels in the harbors on those coasts, required the Carlton to keep out of the way of the Gibraltar as the Carlton was the overtaking vessel and had the Gibraltar on her starboard side. And she should not have attempted to cross the latter's bow, but should have gone around her stern. See rule 8, and articles 19, 22, and 23 of rule 9. Of course, when the collision became imminent, the Carlton did all that was possible to avoid it, but it was then too late. If the Carlton had slackened her speed soon enough and crossed astern of the Gibraltar, as she could very easily have done, there would have been no collision. By her careless and faulty maneuver, she put both vessels in a position of danger. The Gibraltar was not guilty of any fault contributing to the collision. She was in her proper course. That she was slightly to the west of her slip could be accounted for by the tide, but at that she was in position to enter her berth. At any rate, she was not in the Carlton's proper course; that lay east of her. If the Gibraltar was guilty of any error, it was in answering the passing signal of the Carlton, but it is possible that, if she at that moment had blown the danger signal, stopped and reversed her engines, and dropped her anchors, the collision would nevertheless have occurred. We conclude that the Carlton was solely responsible for the collision.

The record presents no reversible error. Affirmed.